AO 91 (Rev. 11/11) Criminal Complaint                    AUSA Alejandro Ortega (312) 353-4129



**FILED**
3/24/2023
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

UNITED STATES OF AMERICA

v.

OMARI ANDREWS, JR.

CASE NUMBER: 23 CR 170

**UNDER SEAL**

### CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about or about February 22, 2023, at Hillside, in the Northern District of Illinois, Eastern Division, OMARI ANDREWS, JR. violated:

| Code Section | Offense Description |
|---|---|
| Title 21, United States Code, Section 841(a)(1) | Knowingly and intentionally distributed a controlled substance, namely, 40 grams or more of a mixture and substance containing a detectable amount of fentanyl (N-phenyl-N-[1-(2-phenylethy)-4-piperidinyl] propanamide), a Schedule II Controlled Substance; a quantity of a mixture and substance containing a detectable amount of heroin, a Schedule I Controlled Substance; and a quantity of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance; and |

This criminal complaint is based upon these facts:

 X   Continued on the attached sheet.

*Michael Honnessy*

MICHAEL HONNESSY
Special Agent, Homeland Security Investigations (HSI)

Pursuant to Fed. R. Crim. P. 4.1, this Complaint is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the Complaint and Affidavit by telephone.

Date: March 24, 2023

*Judge's signature*

City and state: Chicago, Illinois          Jeffrey I. Cummings, U.S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

**AFFIDAVIT**

I, MICHAEL HONNESSY, being duly sworn, state as follows:

1.     I am a Special Agent ("SA") with Homeland Security Investigations ("HSI") and have been so employed since February 2022.  I am currently assigned to the Office of the Special Agent in Charge in Chicago, Illinois, Gangs and Violent Crimes Task Force.  Previously, from December 2019 until my employment with HSI, I was a Border Patrol Agent with United States Border Patrol ("USBP"). I received approximately twenty-four weeks of law enforcement training at the Federal Law Enforcement Training Center ("FLETC") in Artesia, New Mexico and graduated from the USBP academy. For two years I participated in the arrests and investigations of offenses relating to human trafficking and human smuggling using physical and electronic surveillance. From my training and experience with the USBP, I am familiar with the methods used by transnational criminal organizations inside and outside of the United States.

2.     I have received approximately twenty-six weeks of criminal investigative training from the FLETC in Glynco, Georgia and graduated from the Criminal Investigator Training Program (CITP) and HSI Special Agent Training (HSISAT). While at FLETC, I participated in investigations, which included the use of confidential sources and undercover officers, physical surveillance, electronic surveillance, the execution of search and arrest warrants on both physical and digital

environments, including the use of court-ordered intercepts of wire and/or electronic communications, dialed number recorders (pen registers), telephone toll analysis, the arrests of drug traffickers, and the analysis of seized records, physical evidence, and taped conversations. These investigations have involved one, or all, of the following crimes: possession, distribution, possession with intent to distribute, and manufacture of controlled substances, and related laundering of monetary instruments. I have also spoken with confidential informants who have extensive knowledge of the inner workings of major narcotics trafficking organizations. Through these investigations and training, I am familiar with the operations of drug trafficking organizations in the United States.

3. Through my investigations, training, and experience, and my conversations with other law enforcement personnel, I have become familiar with some of the tactics and methods used by narcotic traffickers to smuggle and safeguard narcotics, to manufacture and distribute narcotics.

4. This affidavit is submitted in support of a criminal complaint charging that OMARI ANDREWS, JR. has distributed narcotics, in violation of Title 21, United States Code, Section 841(a)(1).

5. The facts set forth in this affidavit are based on my personal knowledge, my training and experience, information provided to me by other law enforcement personnel, interviews of a confidential source, review of consensual recordings, and physical surveillance. Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging

ANDREWS, JR. with distribution of 40 grams or more of fentanyl, and a quantity of heroin and cocaine, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendant committed the offense alleged in the complaint.

6. The investigation to date has included the use of consensually recorded telephone and in-person conversations. The summaries of recorded conversations in this affidavit do not include reference to all of the topics covered during the conversations. Quoted material from the recorded conversations as set forth in this affidavit is taken from draft summaries, not final transcripts. In certain instances, conversations are summarized and placed in context, and my interpretations of the conversations are included in brackets. My understanding and interpretation of these conversations is based upon by the contents and context of the conversations, my familiarity with the facts and circumstances of this investigation, my experience as a law enforcement officer, my discussions with other law enforcement officers, the experience of other law enforcement agents and officers in this investigation, and other evidence developed during the course of the investigation.

## FACTS IN SUPPORT OF PROBABLE CAUSE

### *Background*

7. Since approximately October 2022, law enforcement, including HSI, the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), and local law enforcement in Skokie and Evanston, Illinois, have been investigating a criminal

street gang known as Only the Guys ("OTG"), which operates in the Skokie and Evanston areas. In particular, law enforcement officials are investigating OMARI ANDREWS, JR. and OMARI ANDREWS, SR., who are believed to be narcotics sources of supply to OTG.

8.     As described below, on or about October 20, 2022, after ANDREWS, JR. sold narcotics to an undercover officer ("UC") during a controlled delivery, a source of information ( "SOI")[1] provided information to law enforcement about ANDREWS, JR. and ANDREWS, SR. who the SOI explained supplied narcotics to OTG that was to be sold in the northwest Chicago area. More specifically, according to the SOI, ANDREWS, JR. is the leader of, and main narcotics supplier for, OTG and distributes narcotics in the north Chicago suburbs, including Skokie and Evanston, because he

---

[1] The SOI cooperated with law enforcement for monetary compensation and, as of the date of this affidavit, was paid approximately $900 in connection with this investigation. The SOI does not have any criminal convictions but told law enforcement officials that s/he sold narcotics on behalf of OTG prior to the summer of 2022. Information provided by the SOI has been corroborated by recorded communications, surveillance, and multiple narcotics seizures. The SOI conducted controlled narcotics purchases from ANDREWS, JR. on or about November 1, 2022, and November 29, 2022. During law enforcement's search of the SOI before the November 1, 2022 controlled narcotics purchase from ANDREWS, JR., officials recovered a firearm magazine, a bag containing a small quantity of marijuana, and approximately $100 in cash. At the time, the SOI had a valid Firearm Owners Identification ("FOID") card issued by the Illinois State Police. Furthermore, according to the SOI, the SOI is a recreational user of marijuana with a legal marijuana card; however law enforcement has not independently verified this information about the SOI's marijuana card. Law enforcement officials seized the magazine, the marijuana, and the cash during this operation and admonished the SOI. After the SOI's November 29, 2022 controlled narcotics purchase from ANDREWS, JR., law enforcement learned that the SOI had recently purchased a small user quantity of cocaine from ANDREWS, SR. without law enforcement's consent. According to the SOI, s/he had purchased the cocaine "for a friend." Law enforcement again admonished the SOI. Accordingly, while law enforcement believes that the information provided by the SOI during the course of its investigation is reliable, HSI terminated its relationship with the SOI on December 6, 2022 and will no longer utilize the SOI in this investigation.

believes that this area is "safer" for narcotics trafficking than other parts of the Chicago area. According to the SOI, ANDREWS, JR. receives drugs from ANDREWS, SR., who is an older member of the Black P Stones street gang. Per the SOI, ANDREWS SR. previously supplied drugs to ANDREWS, JR., while ANDREWS, SR. was in prison, and has continued to do so since his release in 2020. The SOI does not know how ANDREWS, SR. receives drugs, but knows that ANDREWS, JR. distributes approximately two kilograms of cocaine and roughly half of a kilogram of cocaine base per month, which ANDREWS, JR. "cooks" himself. According to the SOI, ANDREWS, JR. also distributes kilogram quantities of heroin and heroin fentanyl mixtures. Per the SOI, ANDREWS, JR. distributes narcotics using two different phones, specifically, the devices with telephone numbers 773-991-6877 ("Subject Phone 1") and 773-818-6290 ("Subject Phone 2").

### On or about October 18, 2022, ANDREWS, JR. Distributes Approximately 2.57 Grams of Heroin to UC1

9. On or about October 18, 2022,[2] at approximately 12:00 p.m., law enforcement officers located in the area of the Woodfield Mall, in Schaumberg, Illinois, observed a black 2016 Volkswagen Jetta with Illinois license plate number CL78690 (the "Jetta")[3] enter a parking lot at the approximate location of 1695 E. Golf Road, in Schaumburg. Law enforcement observed an unknown male ("Individual A")

---

[2] The October 18, 2022, controlled narcotics purchase from ANDREWS, JR., occurred two days prior to the SOI's initial debriefing with law enforcement.

[3] According to law enforcement databases, the Jetta is registered to "Individual B," who, according to law enforcement databases, publicly available social media sources, and the SOI, is ANDREWS, JR.'s girlfriend and the mother of his child.

enter and remain in the passenger seat of the Jetta for approximately 30 seconds. Individual A then exited the Jetta, walked east on Golf Road, and panhandled at the intersection of West Drive and Golf Road.

10.     An undercover law enforcement officer ("UC1") approached Individual A pretending to be a drug user. UC1 told Individual A what UC1 had just seen (the narcotics transaction) and asked Individual A for the phone number of Individual A's drug dealer. According to UC1, Individual A gave UC1 telephone number 773-991-6877 (Subject Phone 1).[4]

11.     Later that same day, at approximately 1:01 p.m., UC1 contacted ANDREWS, JR., who was using Subject Phone 1, and had the following text message exchange:

| | |
|---|---|
| **UC1:** | I need 100 . . . Work bro this [UC name] ima grab 100 tonite u round[?] |
| **ANDREWS, JR.:** | Ok. Just send me the addy [address] when u done. |
| **UC1:** | Ay this is bro rite? Can u get me 100 [worth of narcotics] |

---

[4] Law enforcement officials identified ANDREWS, JR. as a user of Subject Phone 1 as follows: as described below, on or about February 2, 2023 and February 22, 2023, an undercover law enforcement officer (UC2) made arrangements with the user of Subject Phone 1 to purchase narcotics in the parking lot of the Hyatt hotel in Rosemont, Illinois, and a Chase Bank in Hillsdale, Illinois, respectively. In each instance, the user of Subject Phone 1 arrived at the agreed upon location at the agreed upon time and, based on surveillance, and information provided by UC2, the person who distributed narcotics to UC2 was ANDREWS JR. Further, law enforcement officials reviewed the audio and video recording of the meetings and, based on their review of an Illinois driver's license in the name "Omari Andrews Jr.," they identified ANDREWS JR. as the individual who met with UC2 on February 2, 2023 and February 22, 2023.

According to subscriber records, Subject Phone 1 is subscribed under the name "Marlo Stanfieod" [sic] at an address in the 1700 block of Ashley, in Fox Lake, Illinois. Based on my personal knowledge, I know that the name "Marlo Stanfield" was a character from the fictional television show "The Wire," who was the leader of a drug trafficking organization on the show. Accordingly, I believe that the subscriber information for Subject Phone 1 is fictitious.

| | |
|---|---|
| **ANDREWS, JR.:** | I got you [though] . . . c [cocaine] or d [heroin?] |
| **UC1:** | "D [heroin] . . . I got 120 [$120 to spend on heroin] now." |
| **ANDREWS, JR.:** | Ok. |

Based on my training, experience, and knowledge of the investigation, I believe that during the above text exchange, the user of Subject Phone 1 agreed to supply $120 worth of heroin to UC1.

12.     At approximately 2:47 p.m., UC1 texted ANDREWS, JR., who was using Subject Phone 1, and wrote "does 415 work?" ANDREWS, JR. responded, "Yea." UC1 then wrote "Ok I meet u at jewel at westmont then." ANDREWS, JR. responded, "Ok."

13.     According to audio and video recordings and law enforcement surveillance, later that same afternoon, at approximately 4:49 p.m., ANDREWS, JR.[5] who was driving and the sole occupant of the Jetta, arrived at the parking lot of a Jewel store located at approximately 4 E. Ogden Avenue, in Westmont, Illinois. ANDREWS, JR. parked nearby to UC1 and waved over UC1. UC1 then exited his/her undercover vehicle (the "UCV") and walked to the driver's side window of the Jetta. ANDREWS, JR. asked UC1 what UC1 wanted and UC1 responded "120 [$120 worth of heroin]." ANDREWS JR. retrieved five objects wrapped in tin foil containing a

---

[5] Law enforcement officials identified ANDREWS JR. based upon following: On or about November 1, 2022 and November 29, 2022, the SOI met with an individual to purchase narcotics. The meeting was audio and video recorded. After the transaction, law enforcement officials showed a known booking photograph of "Omari Andrews, Jr."—who is personally known by the SOI—to the SOI and the SOI confirmed that the individual was ANDREWS JR., the same person with whom the SOI met to purchase narcotics. Additionally, as described in this affidavit, UC1 and another undercover officer (UC2) both conducted multiple audio and video recorded controlled narcotics transactions with ANDREWS JR. in late 2022 and early 2023. UC1 and UC2 compared the person from whom they made controlled narcotics purchases with a known Illinois driver's license photograph of ANDREWS, JR. and confirmed that it was the same person.

white-brown powder and gave them to UC1 in exchange for $120. UC1 then departed the parking lot and reunited with law enforcement, who took custody of the suspected narcotics.

14.     According to a testing and analysis performed by the DuPage County Crime Laboratory, the white-brown powder tested positive for heroin and weighed approximately 2.57 grams.

### *On or about November 7, 2022, ANDREWS JR. Distributes 4.9 Grams of Heroin to UC1*

15.     On or about November 7, 2022, at approximately 3:23 p.m., UC1 texted ANDREWS, JR., who was using Subject Phone 1 and wrote, "I got 200 [$200 cash to purchase narcotics] can u come out bro . . . Its 4 Ogden in westmont." ANDREWS, JR. responded, "I'll be back around like 7 I can come to u . . . Imma get u right."

16.     Based on my training, experience, and knowledge of this investigation, I believe that during the above exchange, UC1 requested to purchase $200 worth of narcotics from ANDREWS, JR. and ANDREWS, JR. and the UC1 agreed to meet in the strip mall parking lot located at 4 E. Ogden Avenue, in Westmont, later that day for the narcotics transaction.

17.     Later that day, at approximately 7:03 p.m., UC1 and ANDREWS, JR., who was using  Subject Phone 1, had the following text message exchange:

| | |
|---|---|
| **ANDREWS, JR.**: | which way u coming from im leaving Arlington Heights[?] |
| **UC1:** | Woodridge . . . Woodridge near Bolingbrook tho I could just meet at jewe[l] again. |
| **UC1:** | can u do elmhurst[?] |
| **UC1:** | Villa park could be close to middle I could [m]eet at Walmart. |

18. UC1 then departed to meet with ANDREWS, JR. in the parking lot of the Walmart store located in Villa Park, Illinois, for the narcotics transaction.

19. According to audio and video recordings and law enforcement surveillance, at approximately 7:53 p.m., UC1 arrived in his/her UCV at the parking lot of the Walmart located at 900 Route 83, in Villa Park. At approximately 8:24 p.m., a black 2022 Acura RDX with Illinois license plate number DJ75214 (the "Acura")[6] drove into the Walmart parking lot and parked close to UC1's car. ANDREWS, JR. was the driver and sole occupant of the Acura. UC1 exited the UCV, approached the passenger side of the Acura, and opened the door. ANDREWS, JR. then handed UC1 a small baggie filled with a white-brown powder in exchange for $200. UC1 subsequently left the parking lot and reunited with law enforcement, who took custody of the suspected narcotics.

20. According to testing and analysis performed by the DuPage County Crime Laboratory, the white-brown powder tested positive for heroin and weighed approximately 4.9 grams.

**_On or About February 2, 2023, ANDREWS, JR. Distributes Approximately 9.76 Grams of Heroin to UC2_**

21. On or about January 16, 2022, at approximately 10:00 a.m., UC1 texted ANDREWS, JR., who was using Subject Phone 1 and wrote, "Ay I gav my homie ur number bro." ANDREWS, JR. responded "Ok bet." Based on my knowledge of the

---

[6] According to law enforcement databases, the Acura is also registered to "Individual B" who, as described above, is believed to be ANDREWS JR.'s girlfriend.

investigation, I believe that during this communication, UC1 was telling ANDREWS, JR. that UC1 was referring a new customer to ANDREWS, JR.

22. On or about January 17, 2023, at approximately 9:47 a.m., a different undercover law enforcement officer ("UC2") texted ANDREWS, JR., who was using Subject Phone 1, and asked whether ANDREWS, JR. could sell $500 worth of narcotics to UC2 the following day at around 1:30 p.m. ANDREWS, JR. agreed. More specifically, UC2 and ANDREWS, JR., using Subject Phone 1, had the following text message exchange:

| | |
|---|---|
| **UC2:** | Yo what up |
| **ANDREWS, JR.:** | Yea what up |
| **UC2:** | Tryna get some of that same [UC2 wanted to purchase the same narcotics that ANDREWS, JR. had sold to UC1] if you good |
| **ANDREWS, JR.:** | Wya [Where are you?] |
| **UC2:** | Imma need it tomorrow. Like 4 or 5 bills [$400 or $500] worth. Ill hit you up tomorrow n let u no |
| **ANDREWS, JR.:** | Ok |

23. The next day, on or about January 18, 2022, at approximately 12:30 p.m., UC2 texted ANDREWS, JR., via Subject Phone 1, and asked to meet UC2 in Westmont, but did not receive a response. Later that afternoon, at approximately 4:00 p.m., UC2 received a phone call from ANDREWS, JR. who was using Subject Phone 1. During the call, ANDREWS, JR apologized for not responding and told UC2 that he would "get [UC2] next time" [sell UC2 narcotics].[7]

24. On or about January 31, 2023, at approximately 11:54 a.m., UC1 texted Subject Phone 1 and told ANDREWS JR. "my boy [UC2] said u aint hit him bak.

---

[7] This phone call was not recorded.

Homie tryna grab sum weight [purchase narcotics] hes good people". ANDREWS JR., using Subject Phone 1, responded "Bet". Later that day, at approximately 12:30 p.m., UC2 texted ANDREWS, JR., via Subject Phone 1. UC2 and ANDREWS, JR., using Subject Phone 1, then had the following text message exchange:

| | |
|---|---|
| **UC2:** | What up bro you good? |
| **ANDREWS, JR.:** | What up |
| **UC2:** | Shit trying to see if we can get sum going [if UC2 could purchase narcotics] |
| **ANDREWS, JR.:** | What u tryna di |
| **UC2:** | My go to guy now stuff lackin tryna find a new guy [UC2 is trying to find a new drug dealer] |
| **ANDREWS, JR.:** | yea what u tryna spend |
| **UC2:** | 400-500 [$400-$500 worth of narcotics] try |
| **ANDREWS, JR.:** | When |
| **UC2:** | Tomrw round 11 |
| **ANDREWS, JR.:** | Ok |

25.     Based on my training, experience, and knowledge of this investigation, I believe that during the above text exchange, UC2 requested to purchase $400 to $500 worth of narcotics from ANDREWS, JR. and ANDREWS, JR. agreed to meet the following day at 11 a.m. to conduct the transaction.

26.     The next day, on or about February 1, 2023, UC2 texted ANDREWS, JR. via Subject Phone 1 and asked ANDREWS, JR. if he could meet UC2 the following day in the parking lot of the Rivers Casino, near Rosemont, Illinois,[8] and sell $500 worth of narcotics to UC2. ANDREWS, JR. agreed.

27.     The next day, on or about February 2, 2023, at approximately 1:47 p.m., UC2 arrived in the parking lot of the Rivers Casino, located at 3000 S. River Road, in

---

[8] As detailed in the next paragraph, the Rivers Casino is actually located in the neighboring town of Des Plaines, Illinois.

Des Plaines, Illinois. At approximately 2:06 p.m., ANDREWS, JR., who was using Subject Phone 1, texted UC2 that he was 10 minutes away. At approximately 2:20 p.m., UC2 texted ANDREWS, JR., via Subject Phone 1, and said that s/he was in the parking lot of the Hyatt hotel located at 6350 N. River Road, in Rosemont, across from the casino.

28.     According to UC2, audio and video recordings, and law enforcement surveillance, at approximately 2:30 p.m., a blue Hyundai sedan with Illinois license plate number DN43537 (the "Hyundai")[9] driven by ANDREWS, JR. arrived in the Hyatt parking lot. UC2 received a phone call from ANDREWS JR., who was using Subject Phone 1, during which ANDREWS JR. told UC2 to go over to ANDREWS JR.'s car. UC2 got out of his/her UCV and walked over to the Hyundai's front driver's side window. ANDREWS, JR. lowered his window and motioned for UC2 to retrieve a Starbucks coffee cup from the ground by the Hyundai. UC2 retrieved the coffee cup and handed $500 to ANDREWS, JR. A screenshot of ANDREWS, JR. from UC2's covert video recording device is below:

---

[9] According to vehicle registration information, the Hyundai is registered to "Individual C" at an address located on the 500 block of E 79th St., in Chicago. Law enforcement is not aware of any associations between the Individual C and ANDREWS, JR.



29.     According to UC2 and audio and video recordings, UC2 and ANDREWS, JR. had a conversation about UC2 buying more narcotics from ANDREWS, JR. in the future. UC2 then got back into his/her UCV, departed the area, and reunited with law enforcement who took possession of the Starbucks cup that contained the suspected narcotics. Inside the cup, law enforcement recovered a small plastic baggie containing a powdery substance,

30.     According to testing and analysis performed by the Northeast Illinois Regional Crime laboratory, the contents of the baggie tested positive for heroin and weighed approximately 9.76 grams.

31.     After the transaction between ANDREWS, JR. and UC2, law enforcement followed ANDREWS JR. as he departed the Hyatt parking lot in the Hyundai. At approximately 2:55 p.m., surveillance units observed ANDREWS, JR. park outside a condominium complex located at 1365 Ashland Ave, in Des Plaines.

Law enforcement witnessed an unidentified male briefly walked up to the front driver's side window of the Hyundai and then walk away. Based on surveillance, my training and experience, and my knowledge of the investigation, I believe that ANDREWS, Jr., and the unknown male conducted a hand-to-hand narcotics transaction during which ANDREWS, JR. sold narcotics to the unknown male.

### *On or About February 13, 2023, ANDREWS, JR. Distributes Approximately 27.92 Grams of a Fentanyl/Heroin/Cocaine Mixture to UC2*

32.     On or about February 8, 2023, at approximately 12:54 p.m., UC2 exchanged the following text messages with ANDREWS, JR., who was using Subject Phone 1:

| | |
|---|---|
| **UC2:** | What up cuzzo u good? |
| **ANDREWS, JR.:** | What up |
| **UC2:** | That [the narcotics that ANDREWS, JR. previously sold to UC2] was decent tryna see what the ticket [price] on an oz [ounce of narcotics]. Lookin to get 3 and a split [three and a half ounces of narcotics, or roughly 100 grams] every 2 weeks do me right on the ticket [price] and imma fuck wicha [purchase more narcotics from ANDREWS, JR.] |
| **ANDREWS, JR.:** | 3oz of d [heroin]? |
| **UC2:** | Yezzir. 1 [one ounce] next week tho |
| **ANDREWS, JR.:** | Gimmie 4 [offering to sell 4 ounces of heroin] |
| **UC2:** | Aiiygt Let do 1 [one ounce] ata time… |
| **ANDREWS, JR.:** | Ok |

33.     Based on my training, experience, and knowledge of this investigation, I believe that during the above text exchange, ANDREWS, JR. and UC2 were negotiating the sale of additional quantities of narcotics from ANDREWS, JR., to UC2.

34.     A few days later, on or about the morning of February 13, 2023, UC2 texted ANDREWS, JR. via Subject Phone 1, and asked ANDREWS, JR. to meet UC2 later that day in Westmont so that UC2 could purchase approximately one ounce of heroin from ANDREWS, JR. for $1,250, and ANDREWS JR. agreed.

35.     At approximately 3:10 p.m., ANDREWS, JR., using Subject Phone 1, texted UC2 and they agreed to meet in the parking lot near the Target store located at 130 S. Mannheim Road, in Hillside, Illinois. At approximately 3:29 p.m., UC2 arrived in his/her UCV, parked in the parking lot of the Chase Bank located next to the Target store parking lot, and texted his/her location to ANDREWS, JR. via Subject Phone 1.

36.     According to law enforcement surveillance, audio and video recordings, and UC2, at approximately 3:34 p.m., ANDREWS, JR. arrived in the Chase Bank parking lot driving the Hyundai, with an unidentified male ("UM1") sitting in the front passenger seat. UC2 exited his/her vehicle and walked up to the Hyundai. ANDREWS, JR. handed UC2 a Chick-fil-A bag that had been on ANDREWS, JR.'s lap and UC2 handed ANDREWS, JR. $1,250. UC2 took the Chick-fil-A bag, returned to his/her UCV, departed the area, and reunited with law enforcement who took custody of the Chick-fil-A bag. Inside the Chick-fil-A bag, law enforcement recovered a small plastic baggie containing a powdery substance.

37.     According to testing and analysis performed by the Northeast Illinois Regional Crime laboratory, the contents of the small plastic baggie tested positive for a mixture of heroin, fentanyl, and cocaine, and weighed approximately 27.92 grams.

***On or About February 22, 2023, ANDREWS, JR. Distributes Approximately 57.68 Grams of a Fentanyl/ Heroin/Cocaine Mixture to UC2***

38.     On or about February 20, 2023, at approximately 3:20 p.m., UC2 exchanged the following text messages with ANDREWS, JR., who was using Subject Phone 1:

| | |
|---|---|
| **UC2:** | Yoyooo |
| **ANDREWS, JR.:** | Yoo |
| **UC2:** | Wassap my dude. Lookin at Wednesday [to purchase narcotics] |
| **ANDREWS, JR.:** | Ok |
| **UC2:** | What u gone do for me [what price will you charge] on 2 [two ounces of narcotics]? Gimme a deal bruh imma keep fukin [purchasing narcotics] wicha |
| **ANDREWS, JR.:** | Close to 50 [grams of narcotics][10] |

39.     The next day, on or about February 21, 2023, at approximately 1:15 p.m., UC2 called to ANDREWS, JR., who was using Subject Phone 1. UC2 asked ANDREWS, JR. whether ANDREWS, JR. could meet UC2 the following day in Hillside and sell two ounces of narcotics to UC2. ANDREWS, JR. agreed.

40.     On or about February 22, 2023, at approximately 3:40 p.m., ANDREWS, JR., using Subject Phone 1, texted UC2. More specifically, ANDREWS, JR. asked, "What time[to meet for their narcotics transaction]" UC2 replied, "4 oclock What the ticket [price of the narcotics?]" ANDREWS, JR. replied, "2 right." UC2 replied, "2 oz. [two ounces of narcotics]" ANDREWS, JR. responded, "Gimme 2300" [$2,300 for two

---

[10] UC2 asked ANDREWS, JR. how much it would cost for two ounces of narcotics and ANDREWS, JR. responded "50" meaning 50 grams, when UC2 was asking him for a dollar amount. I believe that this was a miscommunication, and the next day UC2 and ANDREWS, JR. clarified that two ounces of narcotics would cost $2,300.

ounces of narcotics]. UC2 agreed and UC2 and ANDREWS, JR. agreed to meet at the Target store parking lot located at 130 S Mannheim Road, in Hillside.

41.     At approximately 4:10 p.m., UC2 arrived in the parking lot of the above-referenced Target store in Hillside, surveilled by law enforcement and equipped with audio and video recording devices. UC2 texted ANDREWS, JR. via Subject Phone 1, and informed ANDREWS, JR. that UC2 had just arrived. ANDREWS, JR., using Subject Phone 1, texted back, "just left the doctor." At approximately 4:27 p.m., UC2 called ANDREWS, JR., who was using Subject Phone 1, and ANDREWS, JR. told UC2 that ANDREWS, JR.would arrive in about 25 minutes.

42.     At approximately 5:38 p.m., ANDREWS, JR., using Subject Phone 1, texted UC2 that ANDREWS, JR. had just arrived. According to surveillance units, audio and video recordings, and UC2, ANDREWS, JR. then pulled into the Target parking lot driving the Hyundai, as the sole occupant. UC2 placed a recorded phone call to ANDREWS JR., who was using Subject Phone 1, and they agreed to meet in front of the T-Mobile store located on the other side of the parking lot.

43.     At approximately 5:40 p.m., ANDREWS, JR. pulled up next to UC2's UCV in front of the T-Mobile store. UC2 eited his/her UCV and went up to the front driver's side window of the Hyundai. ANDREWS, JR. then handed UC2 a small heart-shaped candy box and UC2 then gave ANDREWS, JR. $2,300, which ANDREWS, JR. counted. A screenshot of ANDREWS, JR. during the above-described controlled narcotics transaction, taken from UC2's covert recording device is below:



44.     UC2 asked ANDREWS, JR. whether he could sell UC2 "cracked cards."[11] ANDREWS, JR. responded that he could "find a guy." UC2 then returned to his/her UCV and both UC2 and ANDREWS, JR. departed the parking lot. UC2 reunited with law enforcement who took custody of the heart shaped box containing suspected narcotics. Inside the box, law enforcement recovered a baggie containing a powdery substance:

---

[11] Based on my training and experience, I know that "cracked cards" refers to stolen or fraudulent credit cards or credit card numbers.

 

45.     According to testing and analysis performed by the Northeast Illinois Regional Crime Laboratory, the contents of the baggie texted positive for a mixturne of fentanyl, heroin, and cocaine, and weighed approximately 57.68 grams.

**CONCLUSION**

46.     Based on the foregoing, I submit that there is probable cause to believe that on or about February 22, 2023, at Hillside, in the Northern District of Illinois, Eastern Division, OMARI ANDREWS, JR. distributed 40 grams or more of fentanyl, and a quantity of heroin and cocaine.


FURTHER AFFIANT SAYETH NOT.

*Michael Honnessy*

MICHAEL HONNESSEY
Special Agent
Homeland Security Investigations


SWORN TO AND AFFIRMED by telephone March 24, 2023.

Honorable Jeffrey I. Cummings
United States Magistrate Judge